IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Mar-Lin Minatee, | : |
| Plaintiff, | : |
| | : CIVIL ACTION |
| v. | : |
| City of Philadelphia, et al., | : No. 09-3016 |
| Defendants. | : |

### MEMORANDUM

**ROBERT F. KELLY, Sr. J.**                              **SEPTEMBER 9, 2011**

Presently before the Court is a Motion for Summary Judgment submitted by Defendants the City of Philadelphia (the "City"), Police Commissioner Charles Ramsey ("Commissioner Ramsey"), Mayor Michael Nutter ("Mayor Nutter"), Officer Brian Murphy ("Officer Murphy"), Officer James Dambach ("Officer Dambach"), Officer John McCloskey ("Officer McCloskey"), Lieutenant Joseph Martin ("Lt. Martin"), Sergeant Sean McGlinn ("Sgt. McGlinn"), Sergeant Susan Green ("Sgt. Green"), Detective Brian Boos ("Det. Boos"), and Detective Edward Davis ("Det. Davis") (collectively, "Defendants") and the Response filed by Plaintiff, Mar-Lin Minatee ("Plaintiff").[1]  For the reasons stated below, Defendants' Motion will be granted.[2]

---

[1] Plaintiff is proceeding *pro se*. We have done our best to make sense of his pleadings, briefs, and other submissions and to ascertain the allegations and arguments contained therein.

[2] Although we grant summary judgment in favor of Defendants, there remains one count of excessive use of force against Lieutenant Clifton Lyghts ("Lt. Lyghts") and Officers Rosa Ramos ("Officer Ramos"), Cynthia Frye ("Officer Frye"), John Descher ("Officer Descher"), and Paul Guercio ("Officer Guercio").  The Defendants concede that, there is a genuine issue of material fact regarding Officer Ramos and Officer Frye's involvement in the use of force. (Defs.' Rpt. to Ct. ¶ 6.)  Furthermore, the Defendants have not moved for summary judgment in favor of Lt. Lyghts, Officer Descher or Officer Guercio in relation to the excessive use of force claim.

I. **FACTS**

   A. **Plaintiff's Arrest**[3]

On June 30, 2007 at approximately 2:00 a.m., Plaintiff and his and then fianceé, Donna McCrary ("McCrary"),[4] had just returned home from dinner. According to Plaintiff, he was driving McCrary's newly purchased vehicle, and all paperwork pertaining to the vehicle was current. Plaintiff then entered the street where the residence was located so that they could go into the house. Apparently, parking is very limited in the area, and they were unable to immediately locate a parking spot. Plaintiff pulled the vehicle next to his own vehicle, which was parked on the corner of the two-way street, to let McCrary out of the vehicle so she could go into the house while he continued to look for a parking spot. Plaintiff admits that, at this point, the vehicle was double-parked. Plaintiff then exited McCrary's vehicle to retrieve something from his own parked vehicle. Plaintiff alleges that, a Philadelphia Police patrol vehicle then passed them, performed a u-turn, and came back towards them slowly, while he was in between the two vehicles. The Officers in the car were Officer Rosa Ramos ("Officer Ramos") and Officer Cynthia Frye ("Officer Frye"). The Officers informed Plaintiff that he would have to move the double-parked vehicle, and he responded "hold up one minute, I'm grabbing something, one second, I'm going to go ahead, I'm going to move." McCrary then exited the vehicle from the passenger side and attempted to cross the street to enter the residence. Officers Ramos and Frye continued to drive slowly towards them and to tell them to move the vehicle.

---

[3] Unless otherwise noted, all facts in this section were taken directly from Plaintiff's Deposition, attached to the Motion for Summary Judgment as Exhibit B.

[4] Plaintiff is no longer engaged to McCrary.

The officers then cut McCrary off with their patrol car when she attempted to enter the residence. McCrary then became agitated and "put her hands up." She then turned around, returned to her double-parked vehicle, and entered through the driver's side to retrieve some items. She then "sucked her teeth" at the Officers while attempting to return to her residence.

Apparently, Officer Ramos then jumped out of the patrol car and asked to see McCrary's license and registration. Plaintiff and McCrary informed Officer Ramos that Plaintiff had driven and that it was unnecessary for McCrary to produce her information. It was around this time that Plaintiff asked the Officers to call a supervisor. Plaintiff actually made the call for a supervisor himself. When McCrary finally produced her information to Officer Ramos, Officer Ramos ran her license through her system and found that it was suspended. Next, Lt. Lyghts arrived on the scene and spoke with Plaintiff. Plaintiff showed Lt. Lyghts his identification, explained the situation, and told him that he works as a correctional officer. Plaintiff also contested the fact that McCrary's license was suspended and argued that she had paid all of her tickets pertaining to the suspension. Lt. Lyghts informed Plaintiff that Officers Ramos and Frye were turning the stop into a "Live-Stop"[5] and that a tow truck was en route to tow the vehicle. When the tow truck arrived, Plaintiff got into the vehicle and sat in the passenger seat to prevent it from being towed. Lt. Lyghts attempted to reason with Plaintiff and explained that the Officers were going to take

---

[5] The parties do not attempt to explain the term "Live-Stop." However, our own research reveals that it is a Philadelphia Police Department ("PPD") initiative to enforce the impoundment provisions of the Pennsylvania Vehicle Code. (PPD Citizen Info. Bulletin No. 2, "Live-Stop" Program ¶ 1.) Pursuant to this initiative, "[a]ny vehicle may be impounded when it is determined, during a lawful vehicle investigation that the operator is in violation of the following statutes: (1) Driving Unregistered Vehicle Prohibited; (2) Operation Following Suspension of Registration; (3) Drivers Required to be Licensed; (4) Driving While Operating Privilege is Suspended or Revoked. (Id. ¶ 4.)

3

the vehicle and that Plaintiff should do as he was asked and exit the vehicle. After a disputed amount of time had passed, Plaintiff did exit the vehicle but continued to stand close to it and to argue over the legality of the tow.

Lt. Lyghts informed Plaintiff that he should file a Complaint if he wished to complain of the Officers' actions and demanded that he step away from the vehicle so they could tow it. In response, Plaintiff stated, "Y'all not taking shit," and refused to comply. At this point, Plaintiff admits he was yelling. Lt. Lyghts then pointed a taser gun at Plaintiff and asked him again whether he would comply, but Plaintiff still refused to back down from the vehicle. Plaintiff asserts that Lt. Lyghts then fired the taser at his chest approximately three to four times.[6] Plaintiff then became "aggravated," pulled all the taser prongs out of his chest except for one, and announced that he was ready to be arrested. He then turned around and put his hands behind his back.[7]

Next, Plaintiff claims he was "hit upside the head, hit with a nightstick, toppled to the ground, kicked in [the] jaw, [and] kicked in [the] back." Although Plaintiff could not recall specifically who hit him with a nightstick, punched him, or kicked him at his deposition, he was provided with discovery indicating the identity of those people. At Plaintiff's deposition, he was

---

[6] Plaintiff testified at his deposition that the initial "shot" lodges the taster prongs into the target and that subsequent "shots" activate the electric charge.

[7] Because we must view the facts in the light most favorable to the non-movant, we have only included Plaintiff's version of events. However, we note that Officer Frye testified at the Municipal Court hearing that Plaintiff was loud and yelling throughout the stop and arrest, that he yelled obscenities at her and her partner Officer Ramos, and that he threatened to fight the officers several times. (Pltf.'s Pre-Trial Ex. A, Municipal Ct. Tr. 5-22.) Plaintiff admits in his Citizen's Complaint that he said, "I know we are going to rock and I want you #4902 Ramos to throw the first punch." (Pltf.'s Citizen's Compl. 3.)

4

able to recall that three or four officers made physical contact with him. Plaintiff could not recall whether Officers Ramos or Frye were involved in the fray. Plaintiff has submitted a Philadelphia Police Memorandum relating to his Citizen's Complaint that states Officer Paul Guercio ("Officer Guercio") was involved in his arrest. In addition, Plaintiff alleges that Officer John Descher ("Officer Descher") "used control holds on [him] the night of the incident." (Am. Compl. ¶ 7.)

Plaintiff was then taken to Einstein Hospital to remove the remaining taser prong. While at the hospital, Det. Boos took a post-Miranda statement from Plaintiff and photographed his injuries, which consisted of the taser laceration and bruises. After the taser prong was removed, Plaintiff was taken to jail, where he was confined for at least several hours. Plaintiff alleges that Det. Davis "might have been the one that cuffed [him] to the bench inside the precinct." Police reports show that Det. Davis took a statement from Plaintiff at the station. Plaintiff was charged with harassment, obstruction of justice, disorderly conduct, terroristic threats, and resisting arrest.

Plaintiff also alleges that a number of other officers played a role in his arrest and prosecution. He alleges that Officer Murphy, Officer Dambach, and Officer McCloskey, "signed off on the report which caused Plaintiff to be charged in state court." (Am. Compl. ¶¶ 8-10.) Plaintiff makes no further allegations linking these Defendants to his arrest or prosecution.

B.   **Plaintiff's Citizen's Complaint Against Officer Ramos and Officer Frye**

Shortly after Plaintiff was released from custody, he filed a Citizen's Complaint against Officers Ramos and Frye.[8] (Mot. Summ. J., Ex. D, Pltf.'s Citizen's Compl.) Plaintiff listed two

---

[8] Plaintiff claims that he "sat in jail from Saturday till [sic] Sunday afternoon." (Am. Compl. 5.)

5

witnesses and recounted his version of the events in some detail. (Id.) Plaintiff admits that at least one of his witnesses was interviewed by Philadelphia Police Department of Internal Affairs and he has produced reports from Internal Affairs relating to the investigation of his report. (Id. at Ex. E, Internal Affairs Rpts.) However, after what appears to have been a full investigation, the Internal Affairs Department exonerated all officers.

Plaintiff alleges that the investigation of his Citizen's Complaint was directly linked to his criminal prosecution. Plaintiff further alleges that if the officers were not exonerated, he would not have been prosecuted. (Am. Compl. at 6.) Thus, he states that the officers who investigated his Citizen's Complaint, Sgt. Green and Lt. Martin, "are being sued in [their] **official capacity** for [their] involvement in assisting [the arresting officers] to get me <u>Maliciously</u> <u>Prosecuted</u>." (Id.) (emphasis in original). Plaintiff further alleges that Sgt. Green "interviewed [McCrary] and her son Tevin Williams" in relation to his Citizen's Complaint and that Sgt. McGlinn "approved the Investigation Report which caused Plaintiff to be charged in State Court."

### C. Procedural History

On July 24, 2009, Plaintiff filed a pro se Complaint against the Philadelphia Police Department, the Commonwealth of Pennsylvania (the "Commonwealth"), Governor Edward G. Rendell ("Governor Rendell"), the City, Commissioner Ramsey, Mayor Nutter, Officer Ramos, Officer Frye, and Lt. Lyghts. In his Complaint, Plaintiff alleged that the Philadelphia Police Department, the Commonwealth, Governor Rendell, the City, Commissioner Ramsey, Mayor Nutter, Officer Ramos, Officer Frye, and Lt. Lyghts maliciously prosecuted him in violation of his Fourth Amendment rights, thereby entitling him to monetary damages under 42 U.S.C. §

1983 ("§ 1983").[9] As we will explain below, construing the Complaint and Amended Complaint liberally, Plaintiff also alleges supervisory liability claims against the City of Philadelphia, Commissioner Ramsey, and Mayor Nutter and excessive force claims against Officer Guercio, Officer Descher, and Lt. Lyghts.

On September 3, 2009, Defendants filed a Motion to Dismiss Plaintiff's claims against Governor Rendell and the Commonwealth. We granted the Motion on October 9, 2009 and dismissed Governor Rendell and the Commonwealth from this action, finding that they were not "persons" amenable to suit under § 1983.

On October 28, 2009, Plaintiff filed a "Motion to Modify Complaint" seeking leave to "modify his complaint to remove his claims against the Commonwealth of Pennsylvania and Governor Edward G. Rendell." (Mot. to Modify Compl. at 2.) We granted the Motion on March 3, 2010. On March 26, 2010, Plaintiff filed an Amended Complaint adding ten more Philadelphia police officers as defendants, allegedly because they "had involvement in assisting other Police Officers in the institution of the prosecution of the Plaintiff." (Am. Compl. at 1.) Plaintiff amended his Complaint to add Officer Guercio, Office Descher, Officer Murphy, Officer Dambach, Officer McCloskey, Lt. Martin, Sgt. Green, Det. Boos, Sgt. McGlinn, and Det.

---

[9] Title 42 U.S.C. § 1983 provides, in relevant part:

> Every person who, under color of state statute, ordinance, regulation, custom, or usage . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.

Davis. (Am. Compl. at 2-3.) In the Amended Complaint, Plaintiff also alleges that Officers Murphy, Dambach, and McCloskey occupy a supervisory position in the Philadelphia Police Department and that they "signed off on the report which caused Plaintiff to be charged in State Court." (Id. at 2.) Furthermore, Plaintiff alleges that Lt. Martin, Sgt. Green, Det. Boos, Sgt. McGlinn, and Det. Davis investigated his Citizen's Complaint. (Am. Compl. at 3.) Plaintiff also increased his demand for damages to $30 million.[10] (Am. Compl. at 7.)

On June 3, 2011, both Parties met before the Court for a pretrial status conference. At the conference, we ordered that any further motions were to be filed by June 10, 2011. (June 3, 2011 Status Conf., June 3, 2011, 15:25-16:2.) On June 9, 2011, Defendants filed a Motion for Summary Judgment alleging that Plaintiff had failed to state a cause of action against Defendants the City, Commissioner Ramsey, Mayor Nutter, Officer Murphy, Officer Dambach, Officer McCloskey, Lt. Martin, Sgt. McGlinn, Sgt. Green, Det. Boos, and Det. Davis. On June 23, 2011, Plaintiff filed a Response in Opposition to Defendant's Motion for Summary Judgment arguing that we should dismiss Defendants' Motion as untimely because it was filed after the deadline in our Revised Scheduling Order of December 28, 2010 (Doc. No. 46). As a preliminary matter, we will allow Defendants' Motion for Summary Judgment because they filed it within the extended deadline for dispositive motions set by this Court.

## II. STANDARD OF REVIEW

### A. Motion for Summary Judgment

Federal Rule of Civil Procedure 56(c) states that summary judgment is proper "if there is

---

[10] Plaintiff later increased his demand for damages to $50 million in his Proposed Jury Instructions.

no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." See Hines v. Consol. Rail Corp., 926 F.2d 262, 267 (3d Cir. 1991). The Court asks "whether the evidence presents a sufficient disagreement to require submission to the jury or whether . . . one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986). The moving party has the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "A fact is material if it could affect the outcome of the suit after applying the substantive law. Further, a dispute over a material fact must be 'genuine,' i.e., the evidence must be such 'that a reasonable jury could return a verdict in favor of the non-moving party.'" Compton v. Nat'l League of Prof'l Baseball Clubs, 995 F. Supp. 554, 561 n.14 (E.D. Pa. 1998).

Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. Once the moving party has produced evidence in support of summary judgment, the non-moving party must go beyond the allegations set forth in its pleadings and counter with evidence that presents "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); see Big Apple BMW, Inc. v. BMW of N. Am. Inc., 974 F.2d 1358, 1362-63 (3d Cir. 1992). "More than a mere scintilla of evidence in its favor" must be presented by the non-moving party in order to overcome a summary judgment motion. Tziatzios v. United States, 164 F.R.D. 410, 411-12 (E.D. Pa. 1996). If the court determines that there are no genuine issues of material fact, then summary judgment will be granted. Celotex, 477 U.S. at 322.

## III. DISCUSSION

### A. Municipal Liability Claims Against the City

In order to state a claim for municipal liability under Section 1983, the plaintiff must assert that "the municipal defendants followed some unconstitutional policy or custom." Bey v. City of Philadelphia, 6 F. Supp. 2d 422, 423 (E.D. Pa. 1998) (citing City of Canton v. Harris, 489 U.S. 378, 392 (1989); Monell v. New York City Dep't of Social Servs., 436 U.S. 658, 690-91 (1978)). "Policy" includes official proclamations made by a municipal decision maker with final authority, and "custom" is defined as 'practices of state officials . . . so permanent and well settled as to virtually constitute law.'" Kelly v. Borough of Carlisle, 622 F.3d 248, 263 (3d Cir. 2010) (citing Berg v. County of Allegheny, 219 F.3d 261, 276 (3d Cir. 2000)). The officials who can impose liability on a municipality are those "who edicts or acts may be fairly said to represent official policy." Monell, 436 U.S. at 694. The question of who has final policy-making authority for a municipality is a question of state law, to be decided by the judge by referring to state and local law, as well as custom that has the force of law. Jett v. Dallas Independent Sch. Dist., 491 U.S. 701 (1989).[11] However, a single incident by a lower level employee acting under the color of law does not establish either an official policy or custom. City of Oklahoma v. Tuttle, 471 U.S. 808 (1985).

Plaintiff claims that the City, Commissioner Ramsey, and Mayor Nutter (hereafter, "City

---

[11] Mid-level police officers, including corporal commanding officers, are not "policymakers" with the final authority to establish municipal policy for the City of Philadelphia. Martin v. City of Philadelphia, No. 98-cv-5765, 2000 WL 11831, at *9 (E.D. Pa. Jan 7, 2000). Thus, to the extent that Plaintiff attempts to implicate Commanding Officers Dambach and McCloskey as policymakers capable of incurring municipal liability, such attempt is unsuccessful.

10

Defendants") are responsible for training and supervising police officers.[12] In regards to the City, we find that Plaintiff has not provided any evidence of an unconstitutional official policy or custom that was in effect at the time of his arrest and prosecution that caused him injury. Moreover, Plaintiff has failed to produce specific evidence to support a claim that the City had a custom, policy, or practice that encourages and causes constitutional violations by police officers. Finally, Plaintiff has produced no evidence that a particular custom or policy of the City caused the violation of his constitutional rights. As a result, summary judgment is granted in favor of the City on Plaintiff's Section 1983 claims.

### B. Failure to Supervise Claims Against Commissioner Ramsey and Mayor Nutter

We also find that Plaintiff has not established a claim against Commissioner Ramsey or Mayor Nutter because "[a] defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of *respondeat superior*." Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988) (citations omitted). Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence. Id. Allegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity. Id. In this case, Plaintiff has not alleged, let alone shown, that Commissioner Ramsey or Mayor Nutter had personal involvement in the alleged wrongs or that they personally directed any of the other defendants or had actual knowledge of the alleged wrongs committed against him. Plaintiff has also failed to allege or to show that these Defendants acquiesced in the alleged wrongs against him. For these

---

[12] The Philadelphia Police Department is not a separate legal entity and we will dismiss it from this action. See Johnson v. City of Erie, Pa., 834 F. Supp. 873, 878-79 (W.D. Pa. 1993).

11

reasons, we will grant summary judgment in favor of Commissioner Ramsey and Mayor Nutter.

      C.      **Municipal Liability Claims Against City Defendants for Failure to Train Police Officers**

Under Section 1983, municipal defendants cannot be held liable under a theory of *respondeat superior*; municipal liability only arises when a constitutional deprivation results from an official policy or custom. Montgomery v. DeSimone, 159 F.3d 120, 127 (3d Cir. 1998) (citing Monell, 436 U.S. at 691-94). In order to establish liability under Section 1983 based on an alleged policy of inadequate training and supervision, a plaintiff must satisfy the following prongs: (1) prove that the training and/or supervision was inadequate; and (2) identify with specificity a reasonable policy-maker who knew that said training and supervision was inadequate; and (3) prove that the official knew the said inadequate policies were resulting in the deprivation of constitutional rights; and (4) prove that the identified policy-maker made a conscious choice or was deliberately indifferent to the inadequate procedures and did nothing to correct them; and (5) establish an affirmative link between the alleged policies and the cause of the plaintiff's alleged violation of rights. See Tuttle, 471 U.S. at 808; Harris, 489 U.S. 378.

Inadequacy of training may serve as the basis of Section 1983 liability only where the failure to train amounts to "deliberate indifference" to the rights of persons with whom the police comes into contact. Harris, 489 U.S. at 378. "Deliberate indifference" is not shown by merely alleging that the existence of a training program for a group of employees is a municipal policy for which the city is responsible. See Id. Nor is it sufficient to show that a particular officer has been unsatisfactorily trained because an officer's shortcomings may have resulted from factors other than a poor training program. Id. It is also insufficient to allege that an injury or accident

occurred due to lack of training.  Id.

In order to satisfy the standard, Plaintiff must provide evidence of a conscious decision or deliberate indifference of a high level official determined by the Court, to have final policy-making authority.  In this case, Plaintiff has not provided evidence against the City or City Defendants for failure to adequately train, direct, or supervise.  To the contrary, he has not identified any inadequacy with any training program, produced any evidence to that effect, or shown that the City Defendants were aware of a deficiency in a training program.  Plaintiff's claims for failure to train, direct, or supervise rest on bald assertions that the City Defendants occupy a supervisory position and are responsible for training and supervision of police officers.  This is insufficient to withstand a motion for summary judgment.  See Celotex, 477 U.S. at 322.  Accordingly we will dismiss Plaintiff's failure to supervise and/or train claims against the City Defendants.

### D. Plaintiff's Malicious Prosecution Claims

To establish a claim of malicious prosecution under Section 1983, a plaintiff must establish: (1) the defendants initiated a criminal proceeding; (2) the criminal proceeding ended in the plaintiff's favor; (3) the proceeding was initiated without probable cause; (4) the defendants acted maliciously or for purposes other than bringing a plaintiff to justice; and (5) the plaintiff suffered a deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding.  Kossler v. Crisanti, 564 F.3d 181, 186 (3d Cir. 2009) (en banc).  A plaintiff's failure to satisfy one of the elements of the claim is fatal to his entire claim.  Id. at 187.

Plaintiff alleges that Officer Murphy, Officer Dambach, Officer McCloskey, Lt. Martin, Sgt. Green, Det. Boos, Sgt. McGlinn, and Det. Davis maliciously prosecuted him in violation of

13

his Fourth Amendment rights. The parties do not dispute that Defendants initiated a criminal proceeding, that the criminal proceeding ended in an acquittal of all charges in favor of Plaintiff, and that Plaintiff suffered a deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding. Defendants argue that Plaintiff's claims fail as a matter of law because Officers Ramos and Frye had probable cause to arrest Plaintiff. They also allege that Plaintiff has failed to produce evidence demonstrating that Officer Murphy, Officer Dambach, Officer McCloskey, Lt. Martin, Sgt. Green, Det. Boos, Sgt. McGlinn, and Det. Davis acted maliciously or for any other purpose than to bring Plaintiff to justice.

1. Probable Cause

Probable cause exists when the information known to the officer warrants a reasonable law enforcement officer to believe an offense has been or is being committed by the person being accused. See Paff v. Kaltenbach, 204 F.3d 425, 436 (3d Cir. 2000). The probable cause inquiry looks to the totality of the circumstances; the standard does not require that officers correctly resolve conflicting evidence or that their determinations of credibility were, in retrospect, accurate. Wright v. City of Philadelphia, 409 F.3d 595, 603 (3d Cir. 2005). Furthermore, an arrest is made with probable cause if "at the moment the arrest was made . . . the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that [the suspect] had committed or was committing an offense." Beck v. Ohio, 379 U.S. 89, 91 (1964) (citations omitted). In other words, the constitutional validity of the arrest does not depend on whether the suspect actually committed any crime. Johnson v. Campbell, 332 F.3d 199, 211 (3d Cir. 2003).

Probable cause does not require the same type of specific evidence of each element of the

offense as would be needed to support a conviction.  Wright, 409 F.3d at 602 (quoting Adams v. Williams, 407 U.S. 143, 149 (1972)).  In fact, the evidentiary standard for probable cause is significantly lower than the standard required for conviction.  Id.  Furthermore, "an acquittal in a criminal prosecution is not, per se, prima facie evidence, in an action for malicious prosecution based thereon, of want of probable cause in instituting the prosecution, and, standing alone, is insufficient to sustain a finding of lack of probable cause."  Parry v. Westmoreland County, No. 10-1308, 2011 WL 1637932, at *4 (W.D. Pa. March 21. 2011) (citing H.D. Warren, Annotation, Acquittal, Discharge or Discontinuance of Criminal Charges as Evidence of Want of Probable Cause, 59 A.L.R. 2d 1413 § 2(a) (1958)) (citing *inter alia*, Van Sant v. American Express Co., 158 F.2d 934 (3d Cir. 1946)), vacated on rehearing on other grounds, 169 F.2d 355 (3d Cir. 1947)).  Importantly, the Third Circuit holds that if probable cause exists for one of the offenses charged, a plaintiff's malicious prosecution claim fails as a matter of law.  Wright, 409 F.3d at 604.  See also Kossler, 564 F.3d at 194, fn.8 (upholding Wright's continuing precedential authority in malicious prosecution cases).

Here, the Defendants argue that Lt. Lyghts, Officer Ramos, and Officer Frye (collectively, the "arresting officers") had probable cause to arrest Plaintiff, entitling them to summary judgment as a matter of law.  Furthermore, Defendants argue that Officer Dambach, Officer McCloskey, Lt. Martin, Sgt. Green, Det. Boos, Sgt. McGlinn, and Det. Davis' roles in the arrest and prosecution of Plaintiff were limited and administrative in nature and that Plaintiff cannot show that they performed their duties with malice or for any other purpose than bringing Plaintiff to justice.  Throughout the litigation, Plaintiff's position has been that he has established the elements of malicious prosecution because he was acquitted of all criminal charges.

Furthermore, Plaintiff testified at his deposition that he believes that "Somebody somewhere did something. So the police can't be found not guilty and I'm not guilty. You can't have not guilty parties in the same thing, somebody had to do something." (Pltf.'s Pre-Trial Ex. A, Pltf.'s Dep. 41:7-10.) For the foregoing reasons, we find that the officers had probable cause to charge Plaintiff with at least one of the offenses charged. Accordingly, under Wright, Plaintiff's malicious prosecution claims fail as a matter of law. 409 F.3d at 604.

          a.      Obstructing Justice

In Pennsylvania, a person commits the crime of obstructing justice when a person "intentionally obstructs, impairs or perverts the administration of law or other governmental function by force, violence, physical interference or obstacle, breach of official duty, or any other unlawful act . . ." 18 Pa. C.S.A. § 5101. Here, there is no question that the Officers had probable cause to charge Plaintiff with the crime of obstructing justice, because the uncontradicted evidence shows that Plaintiff sat inside the passenger-side of the vehicle to prevent the Officers from towing it. At Plaintiff's deposition, he testified as follows:

    Q.      So you sat inside the vehicle to prevent the officers from taking it?

    A.      Illegally, correct. From them illegally taking the vehicle.

(Pltf.'s Dep. 71:10-13.) Plaintiff's deposition testimony is consistent with his municipal court testimony. Plaintiff testified in relevant part:

    Q.      You're informed that the tow truck was there to tow your car, right, because it was being live-stopped?

    A.      Not right away.

    Q.      Did they ever tell you the tow struck [sic] was there due–

16

| | |
|---|---|
| A. | After Officer Frye and they referred it to [Lieutenant Lyghts], they told me what was going on. |
| Q. | That the car was being live-stopped? |
| A. | Right. |
| Q. | And you didn't agree with that? |
| A. | Right. |
| Q. | As a result of that, you got in your car? |
| A. | Yes. |
| Q. | The Lieutenant came over and asked you to get out to tow the car at the time? |
| A. | I got out. |
| Q. | And did you get out right away? |
| A. | Maybe a minute. |

(Municipal Ct. Tr., 42:2-20.) In Plaintiff's Citizen's Complaint, he stated that, after learning that his car was about to be towed, he said, "[H]ell no they aren't taking this car she [sic] Donna wasn't driving it." (Pltf.'s Citizen's Compl. 3.) He "then got into the car on the passenger side and locked the doors." (Id.) Furthermore, Lt. Lyghts testified that he and Plaintiff "[w]ent through a long exchange of me trying to reason him to get out of the cart to surrender. He said he's not going to give up the car; do what I have to do. It's at that point that I tasered him." (Municipal Ct. Tr. 32:6-10.) Plaintiff's Citizen's Complaint confirms this version of events. Plaintiff's insertion of himself into the vehicle was, as he admits, intended to prevent the Officers from towing the vehicle pursuant to a live-stop. Furthermore, Lt. Lyghts warned Plaintiff that he would be tasered if he did not step away from the vehicle, which Plaintiff did not immediately

17

do. Plaintiff's interference ended only after Lt. Lyghts tasered him. Thus, we find that the Defendants had probable cause to charge Plaintiff with obstructing justice.

        2.        Whether Defendants Acted Maliciously or for Purposes Other Than Bringing Plaintiff to Justice

The Defendants argue that Plaintiff's inability to demonstrate malice renders his malicious prosecution claim defective. Malice is defined as "ill will in the sense of spite, lack of belief by the actor himself in the propriety of the prosecution, *or* its use for an extraneous improper purpose." Lippay v. Christos, 996 F.2d 1490, 1502 (3d Cir. 1993) (citing Lee v. Mihalich, 847 F.2d 66, 70 (3d Cir. 1988) (emphasis added)).

Plaintiff has produced no evidence whatsoever showing that any of the Defendants prosecuted him out of ill will. Plaintiff has also not produced evidence showing that any of the Defendants lacked belief in the propriety of the prosecution or instituted the proceedings for an extraneous improper purpose. Plaintiff merely alleges that *he* did not believe that the traffic stop was legal or valid and that *he* did not believe that the prosecution was proper. Because Plaintiff has put forth no evidence showing that any of the Defendants shared his belief but continued to prosecute him, the malicious prosecution claim against all Defendants fails for this additional reason.

        3.        Whether Defendants Initiated the Prosecution

Plaintiff's malicious prosecution claim should be dismissed for, yet, another reason. "In most cases, 'a prosecutor rather than a police officer initiates a criminal prosecution.'" Zeglen v. Miller, No. 3:04-cv-1940, 2008 WL 696940, at *8 (M.D. Pa. March 12, 2008), aff'd, Zeglen v. Pappert, 317 Fed. Appx. 233 (3d Cir. 2009) (non precedential), (citing Merrero v. Micewski, No.

18

Civ. A. 96-8534, 1998 WL 414724, at *20 (E.D. Pa. July 22, 1998) (holding that "a plaintiff can not proceed against a police officer for a claim of malicious prosecution because a prosecutor, not a police officer, 'initiates' a proceeding against an individual"). If a prosecutor brings charges, a police officer may only be liable for initiating a criminal prosecution if the officer "fails to disclose exculpatory evidence to prosecutors, makes false or misleading reports to the prosecutor, omits material information from the reports, or otherwise interferes with the prosecutor's ability to exercise independent judgment in deciding whether to prosecute." Telepo v. Palmer Twp., 40 F. Supp. 2d 596, 610 (E.D. Pa. 1999) (quotation omitted).

In this case, Plaintiff has failed to show that the Defendants failed to disclose exculpatory evidence to the prosecutor, made a false or misleading report to the prosecutor, omitted material information from the reports, or otherwise interfered with the prosecutor's ability to exercise independent judgment in deciding whether to prosecute. Thus, we find that Plaintiff's malicious prosecution claim against all Defendants fails for this additional reason. Accordingly, we will grant summary judgment in favor of all defendants on this additional ground.

## IV. CONCLUSION

In conclusion, we grant summary judgment in favor of the City Defendants on all municipal supervisory and/or failure to train claims. Furthermore, with regard to Plaintiff's malicious prosecution claim, we grant summary judgment in favor of all Defendants, because we find that the proceeding was initiated with probable cause and Plaintiff cannot show that Defendants acted with malice. The sole remaining claim to be litigated at trial is Plaintiff's excessive use of force claim against Lt. Lyghts, Officer Ramos, Officer Frye, Officer Descher, and Officer Guercio.

An appropriate Order follows.